IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 18, 2006 Session

## LISA DAWN WINTON HAINES v. LEE ALAN HAINES

**Appeal from the Circuit Court for Blount County**
**No. E-18839     W. Dale Young, Judge**

———————————————

**No. E2005-02180-COA-R3-CV  - FILED JANUARY 4, 2007**

———————————————

In this post-divorce proceeding, the trial court granted the petition of Lee Alan Haines ("Father") to change the custody of the parties' two minor children from Lisa Dawn Winton Haines ("Mother") to Father.  The change in custody followed a bench trial at which the trial court heard, in chambers, the testimony of the children as elicited by the leading questions of the Guardian Ad Litem ("the GAL").  The examination took place outside the physical presence of counsel for the parties.  Mother appeals, (1) challenging the change of custody; (2) questioning evidentiary rulings by the trial court; and (3) asserting that the trial court erred in allowing the children to be questioned in chambers by the GAL outside the physical presence of counsel for the parties.  We hold that the in-chambers proceeding, as designed and conducted by the trial court, constitutes error.  Because we deem the error to be a violation of due process and prejudicial to the judicial process, we vacate the trial court's judgment *in toto* and remand for a new trial before a different judge.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Vacated; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Geri D. Spindel, Knoxville, Tennessee, for the appellant, Lisa Dawn Winton Haines.

Kirk Andrews and Laura Jane Webb, Maryville, Tennessee, for the appellee, Lee Alan Haines.

No brief filed on behalf of Jerry W. Cunningham, Maryville, Tennessee, Guardian Ad Litem for Abigayle Leigh Haines and Jessica Dawn Haines.

## OPINION

I.

Mother and Father were divorced on September 17, 2001. The parties entered into, and the trial court approved, a Marital Dissolution Agreement ("the MDA"), which provides that Mother is to have sole custody of the children, Abigayle Leigh Haines (DOB: August 24, 1994) and Jessica Dawn Haines (DOB: October 30, 1995) (collectively "the children"). Pursuant to the MDA, Father was to have reasonable visitation with the children, including every other weekend, alternate holidays, one week at Christmas, and two weeks in the summer.

On November 6, 2003, Father filed a petition for change of custody. Father alleged that a substantial and material change of circumstances warranted a modification of custody and that it was in the best interest of the children that they reside with him. Father set forth the following grounds in support of his petition:

> That prior to the divorce [Mother] moved with the children to Middle Tennessee. She subsequently took a job as a Jailor in White County.
>
> [Mother] has cohabited with men to whom she is not married.
>
> [Mother] has taken the children into a bar in Texas where the children remained with her in the bar while she drank alcohol and played poker.
>
> That since moving with the children, [Mother] has had a pattern of having boyfriends and babysitters who have criminal records. It is known at this time that [Mother's] current boyfriend is imprisoned in Titusville, Tennessee. [Mother] has taken the parties' minor children, on at least two occasions, to this facility and exposed the children to the security checks and general unhealthy prison atmosphere. [Mother] has also encouraged the minor children to write letters to her boyfriend in prison.
>
> Further, [Mother] has left the children alone overnight instead of providing adequate and proper supervision for the parties' minor children herself. [Father] would aver that [Mother] has failed to provide a safe environment in which the minor children may reside during coparenting time or as part of her sole custody of the children.
>
> That [Mother] has recently left her previous job due to an in-house investigation concerning allegations that she was selling prescription drugs in the jail. Since leaving this position, [Mother] has taken a new job in Nashville, Tennessee which requires her to begin work at

> 7:00 a.m. Therefore, she has been taking the children to a friends [sic] house at approximately 4:00 a.m[.] to catch the bus for school.

(Paragraph numbering in original omitted). Father sought temporary and permanent custody of the children, as well as a temporary restraining order prohibiting Mother from interfering with his custody of the children.

The trial court adopted a temporary parenting plan that vested temporary custody of the children with Father. The plan provided that Mother would have visitation with the children every other weekend. Following a hearing on November 14, 2003, the trial court ordered that a temporary restraining order previously entered against Mother be made permanent pending a final hearing.

On January 7, 2004, the trial court entered an order providing that Mother would have all reasonable access for co-parenting time and for telephone contact with the children. On August 3, 2004, the trial court modified its earlier order by restricting Mother's telephone contact. The latter order also permitted Father to tape-record all telephone conversations with Mother.

On October 18, 2004, Father filed a motion requesting that Mother's co-parenting time with the children be supervised. In support of this motion, Father alleged that Mother directed the children to misbehave in Father's care for the purpose of affecting the outcome of this case; that she instructed the children to falsely report to their teachers that they were scared of their stepmother, Karen Haines; and that she told the children to expose their genitals to their stepbrother for the purpose of creating trouble. On November 15, 2004, the trial court ordered that Mother's co-parenting time with the children be supervised at the Gardner Place in Maryville and further that Mother's visitation with the children at their schools was suspended.[1]

The trial court conducted a bench trial on May 25, 2005, and on June 14, 2005. On the first date of the hearing, the trial court heard the testimony of the minor children in chambers outside the presence of counsel for the parties. The examination was conducted by the GAL, with the parties and counsel observing via closed circuit television. The parties' attorneys were then allowed to go into the court's chambers to ask questions of the children.

The trial court also heard the testimony of Father; his new wife; Mother; her new husband; and numerous other witnesses who testified on behalf of Mother. After taking the matter under advisement, the court entered its final judgment on August 31, 2005, granting Father's petition for change of custody and adopting the proposed findings of fact and conclusions of law submitted by Father.

---

[1]It appears from the record that a hearing took place on Father's motion on October 26, 2004 and that the GAL testified and filed written reports favoring Father on the allegations made (although the transcript of these proceedings is not contained in the record). We note that Mother's reply brief includes an argument that the trial court erred by entering an order based upon the GAL's testimony and reports. This matter was not presented in the "issues" section of Mother's initial brief as required by Tenn. R. App. P. 27(a)(4). Accordingly, we will not consider this issue.

The factual findings that formed the basis of the trial court's decision to modify custody include the following:

> It is specifically found that [Mother] acted inappropriately with the minor children, Abigail[2] and Jessica, in that [Mother] took the minor children to a state prison on many occasions to visit with an inmate with whom she had a personal relationship. It is specifically found that [Mother] instructed the minor children to lie to the Judge in this case about the fact that [Mother] had co-habited with various men in the presence of the children. Further, it is found that [Mother] instructed the minor children to act badly with [Father] during the co-parenting exchanges. Specifically it is found that [Mother] told the children to scream, cry, and refuse to go with [Father] when [Mother] met [Father] at the Cookeville, Tennessee McDonald's restaurant, and that she did this on more than one occasion. Further, it is found that [Mother] instructed the minor children to expose their genitals to their younger step-brother Bryce in order to facilitate the step-brother acting similarly and, therefore, providing [Mother] with reasons why the minor children should be removed from [Father's] home. Additionally, it is found that [Mother] instructed the minor children to lie to their school teachers saying that they were afraid of [Father's] wife, and that she did this in order to further [Mother's] pending case. Further, it is found that [Mother] further asked the minor children to behave badly and cause problems in the home with [Father] and his wife, Karen. It is specifically found that [Mother] took the minor children to beer parties, poker games and to a bar in Texas that served alcohol. Further, it is found that [Mother] placed photos of the minor children on the automobile that she was using or traveling in, and that these photos surrounded a prominent sign stating "BLOUNT COUNTY COURT TOOK MY CHILDREN AWAY FROM ME. GUILTY UNTIL PROVEN INNOCENT", and that this was inappropriate and placed the minor children and the parties in this case at risk in that strangers would perhaps be incited to some action by this inflammatory sign.

(Capitalization in original; paragraph numbering in original omitted). The trial court specifically found that Father was credible and that Mother lacked credibility.

II.

Mother appeals and raises the following issues:

---

[2]Abigayle's name is misspelled in the transcript.

1.  Did the trial court err in hearing the testimony of the parties' minor children in chambers without the presence of counsel for either party and allowing the GAL to interrogate the children in a leading manner about their opinions and other matters?

2.  Did the trial court err in refusing to admit hearsay statements into evidence when they were subject to a hearsay exception?

3.  Did the trial court err in granting Father's petition for change of custody without evidence of a material change in circumstances?

III.

Our review of the trial court's findings of fact is *de novo* upon the record, which comes to us accompanied by a presumption of correctness, a presumption we must honor unless the preponderance of the evidence is against those findings. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). There is no presumption of correctness as to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

IV.

Mother asserts that the trial court erred when it permitted the minor children to be interrogated by the GAL about their opinions and other matters in a leading manner in chambers outside the presence of parties' counsel. We agree.

On April 15, 2005, Mother's counsel filed a motion with the trial court seeking to have the children appear before the judge for a "private in chambers meeting." The motion specifically stated that "Jessica and Abigayle should have an opportunity to speak with the Honorable Judge Young privately without the influence of either party to assist in making a final decision that is in their best interests." On May 16, 2005, a few days before the hearing, the trial court entered an order addressing the motion as follows:

> The Motion to hear the parties [sic] minor children in the Honorable Judge Young's chambers is granted and agreed upon by both parties;
>
> The parties [sic] minor children will serve merely as fact witnesses only;
>
> The [GAL] shall be present in chambers during the time that the children are to speak to the Judge; and

> The Honorable Judge Young will determine on the 25[th] day of May, 2005 whether counsel for both parties shall also be present in chambers while the children speak to the Judge.

(Paragraph numbering in original omitted). We have gleaned from the record that the trial court later determined that the interview of the children would take place outside the physical presence of the parties and their counsel; that the children would be placed under oath; and that counsel would be permitted in chambers to ask questions after having observed, by closed circuit television, the GAL's questioning.

The questioning of the minor children by the GAL in the judge's chambers outside the presence of counsel for the parties consumes approximately 25 pages of the transcript. In order to give the reader the "flavor" of the interrogation, we have attached the most pertinent parts of the GAL's interrogation as an appendix to this opinion.

At the conclusion of the GAL's examination, the trial court permitted counsel for the parties to enter the room where the interrogation had occurred. They were then allowed to ask the children questions. During this time, Father's counsel elicited testimony from the children that Mother had told them to expose their private parts to their stepbrother and that Mother had instructed them to tell their teachers that they were scared of their stepmother, Karen. At this time, the GAL asked one final question about whether Mother had instructed the children to be difficult to get along with in the presence of Karen, and the children answered in the affirmative.

Mother's objection to the procedure utilized by the trial court is threefold: first, she contends it was reversible error based solely upon the fact the trial court permitted the questioning of the minor children by the GAL to be conducted outside the presence of the parties' counsel; second, she argues that it was error for the trial court to allow the GAL to interrogate the children in such a blatantly leading manner; and finally, she asserts that it was error for the trial court to allow the GAL to interrogate the children about their opinions since the trial court's order had provided that the children would "serve merely as fact witnesses only."

In response to Mother's argument with respect to the absence of counsel, Father contends that Mother was the one who requested that the children be interviewed privately in chambers; that counsel, while not physically in the room, observed the children's testimony through closed circuit television; and that, once counsel were permitted into the trial court's chambers to ask questions, Mother's counsel failed to object to the previously-given testimony. Father further asserts that the trial court properly exercised its discretion in allowing the GAL to ask the children leading questions. Finally, as to the issue of asking the children for their opinions, Father maintains that his petition for change of custody was granted because he made out a solid case showing a material change of circumstances and the best interest of the children. He contends the children's testimony that they preferred to live with him had very little impact on the outcome.

In ***Rutherford v. Rutherford***, 971 S.W.2d 955, 956-57 (Tenn. Ct. App. 1997), we held that

[t]he Trial Judge has discretion to interview children apart from the courtroom setting if he considers it is in the best interest of the child. However, if he elects to follow this procedure, *he must examine the child "in the presence of attorneys for each side* and in the presence of the court reporter" *Newburger v. Newburger*, 10 Tenn. App. 555, 566 (1930), and in order to have a complete record on appeal, a transcript of such evidence must be filed.

(Emphasis added). In *Rutherford*, the father filed a petition to rehear, pointing out that the mother failed to object to the procedure utilized by the trial judge. *Id.* at 957. In response to this argument, we filed another opinion, in which we said the following:

While we agree that counsel should have objected, failure to object does not insulate the Trial Court from committing reversible error, which we held was to interview the child without making a record of the interview for purposes of review on appeal in the absence of the attorneys.

*Id.*

In an earlier decision, *State v. Mitchell*, No. 03A01-9602-JV-00043, 1996 WL 659060, at *2 (Tenn. Ct. App. E.S., filed Nov. 14, 1996), we were presented with a factual scenario involving an interview of a child by a trial judge with only the guardian ad litem and the court reporter present. We noted that "the practice of interviewing witnesses in chambers without counsel being present violates the litigant's right to due process of law." *Id.* at *3. In a more recent case, *Mulkey v. Mulkey*, No. E2004–00590-COA-R3-CV, 2004 WL 2412610, at *3 (Tenn. Ct. App. E.S., filed Oct. 28, 2004), the trial judge interviewed the children *in camera* with the parties' attorneys present but without a court reporter. Judge Herschel P. Franks, who authored the decision in *Rutherford*, filed a concurring opinion in *Mulkey* in which he noted that the failure to follow the procedure outlined in *Rutherford*, *i.e.* having both the attorneys and a court reporter present for the examination of a child, "is grounds, standing alone, to vacate and/or reverse" the trial court's judgment. *Id.* at *6.

Relying upon *Rutherford*, we agree with Mother that the trial court's failure to allow the parties' counsel to be physically present in chambers during the GAL's examination of the children constitutes reversible error. Father appears to suggest that Mother invited this error by filing a motion in which she requested that the children speak to the judge "privately without the influence of either *party*." (Emphasis added). We disagree. The motion refers to the "part[ies]" not being present; it says nothing about *counsel* for the parties. Mother is not culpable in the trial court's error.

Moreover, we are disturbed by the overall tenor in which the GAL interrogated the children *on direct examination*. The GAL began by asking the children: "Do you understand what this is all about? We've been over it many times, haven't we?" The children nodded affirmatively to these questions. At the conclusion of his questioning, the GAL asked the children: "And what else did you

volunteer to do this morning? Do you remember you asked me if I was retiring and running for mayor, and you volunteered to vote for me, didn't you?" Again, the children nodded affirmatively, and when asked who told them that he was running for mayor, one child answered, "Daddy." At one point, the GAL even asked the children, "You want your mom to get some help, don't you?"

As can be seen from a reading of the appendix, the GAL interrogated these children, who were at a young and impressionable age, with very leading questions. One example involved the issue of Mother taking the children to visit an inmate in prison. The following questions are illustrative:

> Now, you told me when I first met you that one of the things that really, really troubled you was when you all would have to go to the penitentiary to see your mom's boyfriend, Tex; do you remember that?;
>
> And she took you to the penitentiary about fifteen times you told me.;
>
> And that scared you every time and you didn't like that at all, did you? Is that right?;
>
> And we got that taken care of so you didn't have to go back to the penitentiary, you remember. And I'm sure that Judge is not ever, ever going to let anybody take you to the penitentiary again. Okay? That was frightening, wasn't it?;
>
> And you had bad dreams about it and everything, didn't you?; and finally
>
> Huh? But those bad dreams are over now. And I'm sorry I have to bring that back up, but that's part of what you shared with me that troubled you, wasn't it?

The GAL elicited the following testimony from the children while the parties' counsel were not present: (1) Mother took the children to visit her boyfriend in jail about 15 times and this was really troubling to them; (2) Mother told the children to lie to the judge about a man named Tom spending the night; (3) Mother told the children to misbehave and be difficult when it was time to exchange with Father; and (4) Mother had several men spend the night in the presence of the children. Father points out that Mother failed to object once the attorneys were permitted in chambers to question the children. While we agree that it would have been preferable for Mother to state her objection on the record, we note that the "cat was already out of the bag," so to speak, by the time the attorneys were permitted in the court's chambers. *See also* **Rutherford**, 971 S.W.2d at 957 (noting that counsel's failure to object "does not insulate" the trial court from committing the

reversible error of interviewing the child in the absence of the attorneys and without making a record of the interview).

As demonstrated by the numerous examples in the appendix, we conclude that the trial court's decision to modify custody in favor of Father was tainted by the evidence that came through the examination of the children by the GAL. Indeed, while being questioned in a leading manner as to their opinions and other matters, the children testified about most of the factual findings[3] made by the trial court in support of its decision to modify custody. It is clear that a substantial basis for the trial court's decision relates back to the tainted, *i.e.*, given outside the physical presence of counsel, testimony that was elicited by the GAL.

We hold that the right to have counsel physically present during a trial court's interview of a child is a substantial right, implicating, as it does, a litigant's right to due process. The violation of this constitutional right in the instant case, without more, justifies our decision to vacate the trial court's judgment. However, even if we were to hold that this error does not rise to the level of a constitutional violation, it would still be a serious procedural error and one that "more probably than not affected the judgment . . . [and] result[ed] in prejudice to the judicial process." Tenn. R. App. P. 36(b).

Because we find it necessary to vacate the judgment of the trial court, and in the interest of fairness, we direct the trial judge, with respect to future proceedings in this matter, to interchange with another judge in his district or seek the appointment of another judge by the Administrative Office of the Courts. Mother is entitled to have Father's petition heard by a judge who has not been exposed to this tainted testimony.

V.

Mother argues that the trial court erred in refusing to admit admissible hearsay statements into evidence. Because this case is being remanded for a new trial, we choose to address this issue. We conclude that the hearsay statements are not subject to the exceptions urged by Mother. Hence, we hold that the trial court was not in error when it refused to admit the testimony into evidence.

Mother specifically contends that two pieces of hearsay evidence should have been admitted under the excited utterance exception to the hearsay rule. She also argues that the testimony was admissible because it was not offered to prove the truth of the matter asserted.

Lee Huddleston testified on behalf of Mother. The witness is the cousin of Mother's new husband. During Mr. Huddleston's testimony, he stated that he was carving pumpkins with the parties' children during a family reunion. He explained that one of the children was very relaxed and

_____

[3]Only two factual findings – that Mother took the children to beer parties, poker games, and a bar in Texas and that Mother inappropriately placed photos of the children with a sign in her car and in doing so placed the children at risk – were not included in the testimony of the children.

then suddenly became extremely upset and began stabbing the pumpkin while exclaiming, "I hate you, I hate you, I hate you." Father's counsel objected to this testimony, and the trial court sustained the objection. In attempting to defend the admission of this testimony, Mother argued that she believes the child was actually referring to the child's stepmother, Karen, during this incident.[4]

The second piece of hearsay evidence came through the testimony of Barbara Burgess, with whom Mother and the children had lived for a short period of time. Ms. Burgess testified that one of the children, who was visibly upset, confided in her that their stepmother Karen had blamed the children for "kill[ing] her baby." Apparently, and unfortunately, Karen Haines suffered a miscarriage at some point in time. Again, counsel for Father objected, and the trial court quickly sustained the objection.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Such a statement is not admissible unless it is shown to be admissible "as provided by the[] rules [of evidence] or otherwise by law." Tenn. R. Evid. 802. Tenn. R. Evid. 803(2) provides a hearsay exception for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rule that "trial courts have broad discretion in determining the admissibility of evidence" is well established. *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997). Therefore, an appellate court will not reverse a trial court's ruling regarding the admission or exclusion of hearsay evidence absent an abuse of discretion. *Id.*

In reverse order, we first address Mother's contention that these two pieces of evidence do not qualify as hearsay because, according to her, they were not offered to prove the truth of the matter asserted. Mother appears to argue that the two statements were not offered to prove that the child in fact hated the stepmother or that the stepmother in fact blamed the children for a miscarriage, but rather that the statements were offered to show that the child was in a distraught state of mind. We disagree with Mother and conclude that the statements were indeed hearsay because they were offered to prove the truth of a negative relationship with the stepmother.

Having determined that the statements meet the hearsay definition, we next address Mother's argument that the hearsay statements qualify for the excited utterance exception under Tenn. R. Evid. 803(2). We conclude that the child's statements (1) relating to hating someone, supposedly her stepmother, and (2) as to being blamed for her stepmother's miscarriage, do not meet the excited utterance exception urged by Mother. These statements simply do not "relat[e] to a startling event or condition," and they were not "made while the declarant was under the stress of excitement caused by the event or condition," as required by the evidentiary exception under discussion. Indeed, Mr. Huddleston testified that the child was very relaxed while carving the pumpkin and then suddenly got upset without explanation. As for Ms. Burgess, she testified that the child was visibly upset

---

[4]We note, in passing, that there is no evidence to support Mother's "belief." Hence, we doubt the testimony's relevancy even if otherwise admissible under the Rules of Evidence.

when she confided in her, but there is nothing in her testimony to indicate that there was a "startling event or condition" or that the child was under the "stress of excitement" engendered by such an event or condition when she made the statement to the witness.

Based upon this analysis, we conclude that the trial court did not abuse its discretion in refusing to admit the hearsay statements at issue. Accordingly, we affirm the trial court's decision to exclude the subject testimony.

VI.

Finally, Mother contends that the trial court erred in granting Father's petition for change of custody without evidence of a change in circumstances. In view of our decision on the issue of the GAL's interrogation of the children outside the presence of the parties' counsel, which requires a new trial, we do not reach the merits of Mother's claim that there has not been a change in circumstances in this case.

VII.

We vacate the judgment of the trial court changing custody of the children from Mother to Father. This case is remanded for a new trial before a different trial judge. Costs on appeal are taxed to the appellee, Lee Alan Haines.


_____
CHARLES D. SUSANO, JR., JUDGE

# APPENDIX
## TO OPINION IN
## LISA DAWN WINTON HAINES V. LEE ALAN HAINES

[The GAL]: . . . Do you understand what this is all about?  We've been over it many times, haven't we?

ABIGAIL[1] HAINES: (Nods head affirmative.)

JESSICA HAINES: (Nods head affirmative.)

[The GAL]: And that the only thing that Judge Young is interested in, is what's in Abby Haines' and in Jessica Haines' best interest.  What's in your best interest, you know that's what we're here about, don't you?

ABIGAIL HAINES: Yes.

[The GAL]: Let's see, I've been your lawyer how long?  Two years, over two years.  We first started in December of 2003, remember?

ABIGAIL HAINES: Yeah.

JESSICA HAINES: Yes.

                    *     *     *

[The GAL]: Okay.  Listen, you and I have talked about a lot of things that have happened in your lives.  And some of them aren't much fun to talk about, are they?

ABIGAIL HAINES: True.

[The GAL]: And that's what we're here is to -- the last day, I think, that we'll have to go through this, isn't it, Judge?

THE COURT: Yes, it is.

[The GAL]: On telling about good things and bad things and then we can get on down the road with life and be happy and be shared

_____

[1]As previously noted, the child's name is misspelled throughout the transcript.

by your parents and everybody just love you and not put you through what you've been through before. Okay?

Now, you told me when I first met you that one of the things that really, really troubled you was when you all would have to go to the penitentiary to see your mom's boyfriend, Tex; do you remember that?

ABIGAIL HAINES: Yeah.

[The GAL]: And she took you to the penitentiary about fifteen times you told me.

ABIGAIL HAINES: Yeah.

[The GAL]: And that scared you every time and you didn't like that at all, did you? Is that right?

ABIGAIL HAINES: Yeah.

[The GAL]: And we got that taken care of so you didn't have to go back to the penitentiary, you remember. And I'm sure that Judge is not ever, ever going to let anybody take you to the penitentiary again. Okay? That was frightening, wasn't it?

ABIGAIL HAINES: Yes, it was.

[The GAL]: And you had bad dreams about it and everything, didn't you?

ABIGAIL HAINES: Yes.

[The GAL]: Huh? But those bad dreams are over now. And I'm sorry I have to bring that back up, but that's part of what you shared with me that troubled you, wasn't it?

ABIGAIL HAINES: Yes, it was.

[The GAL]: All right. Now, you got up here and you asked -- and your mom was coming to the school every Wednesday and that was disruptive, and you asked me to tell the Court that you don't want her coming to the schools, didn't you?

-2-

ABIGAIL HAINES: Yes.

[The GAL]: And you still feel that way?

ABIGAIL HAINES: Yeah.

[The GAL]: Okay.  You too, Ms. Jess?

JESSICA HAINES: Uh-huh (affirmative).

[The GAL:] Okay.  All right.  Now, when you were down and visiting with your mom, did you see a fight between Tom and Jerry?  And I don't mean Tom and Jerry, the cat and the mouse, but I mean Tom and Jerry, two of your mom's boyfriends.

ABIGAIL HAINES: Yeah.  Mom was out getting her car fixed and --

[The GAL]: One of them was an old boyfriend and one of them was a new boyfriend?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: And just tell the Judge what you saw down there.

JESSICA HAINES: We were watching T.V., the door bell rang --

[The GAL]: Speak up, honey.

JESSICA HAINES: We were watching T.V., the door bell rang and it was Tom.

ABIGAIL HAINES: It was Jerry.  Tom was already in the house.

JESSICA HAINES: No.  Jerry was folding his clothes.

[The GAL]: Well, I tell you what --

JESSICA HAINES: You tell it.

[The GAL]: No, you go ahead and tell it your way, Jessica, and then Abby can tell it her way.  How's that?  You go ahead, honey.

JESSICA HAINES: And then I --

[The GAL]: The door bell rang and who was it?

JESSICA HAINES: Tom. And then Jerry called me in there. I said, hold on to Tom and Jerry called in there and asked who was it, and I said one of my mom's friends. And so then Jerry came in and shut the door. And then I can't remember the rest. Tom – I think Tom set something down and then he left because he was all mad at Mom for him coming by.

[The GAL]: And your mom made you call and beg him to come back on her cell phone, didn't she?

JESSICA HAINES: Yes.

[The GAL]: And you didn't want to do that.

JESSICA HAINES: Right.

[The GAL]: Okay. Now, how do you remember it happening, Abby?

ABIGAIL HAINES: I remember it as the door bell rang and I answered it and it was Jerry. And Tom called me back and asked me who it was and I said, Jerry. And then I can't remember what happened after that.

[The GAL]: All right. It wasn't much fun, was it?

ABIGAIL HAINES: No.

[The GAL]: Those two boyfriends were mad at each other.

ABIGAIL HAINES: Yeah.

[The GAL]: And then your mom came home and she was crying or upset?

ABIGAIL HAINES: Yeah.

[The GAL]: Did she have you try to call -- which one?

-4-

ABIGAIL HAINES: Tom.

JESSICA HAINES: Tom.

[The GAL]: Tom?  Okay.  Was Tom living there at that time?  Had he moved in?

ABIGAIL HAINES: I don't think.

[The GAL]: There was one guy that was there all night when you guys were there too, wasn't he?

ABIGAIL HAINES: That was Tom.

[The GAL]: That was Tom.  And your mom told you to lie about that, didn't she?

ABIGAIL HAINES: Yeah.

[The GAL]: And not tell the truth to the Judge?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: But he was there when you went to bed and he was there when you got up, wasn't he?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: And he stayed in your mom's room, didn't he?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: All right.  When it came time to go back home to your daddy, how did your mama tell you to act?

ABIGAIL HAINES: She told us to crawl up in the playground equipment.

[The GAL]: At McDonald's?

JESSICA HAINES: Yeah.

ABIGAIL HAINES: Yes.  And --

JESSICA HAINES: She said Dad would have to come up and get us.

[The GAL]: To crawl up there and refuse to come down and pitch a fit?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: And did she tell you to do that on more than one occasion?

ABIGAIL HAINES: Yep.

[The GAL]: Every time that your daddy came to get you, did your mom tell you to cry and throw a fit and act like you didn't want to go back?

ABIGAIL HAINES: Yep.

[The GAL]: And was that difficult?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: And that wasn't really the way you felt, was it?

ABIGAIL HAINES: True.

[The GAL]: You want your mom to get some help, don't you?

ABIGAIL HAINES: Yes.

JESSICA HAINES: Yeah.

[The GAL]: But you told me that you want to stay up here and go to school here and live with your daddy and Karen. And however the Judge feels you ought to see your mom, then that's what -- that's what it will be. You want the Judge to make the decision, don't you? Isn't that what you told me?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: But you guys want to stay here?

ABIGAIL HAINES: Yep.

JESSICA HAINES: (Nods head affirmative.)

[The GAL]: Now, back a long time ago before we're going to the penitentiary, there was a guy named Matt, wasn't there?

ABIGAIL HAINES: Yes, there was.

[The GAL]: Do you remember him?  And he lived with you guys too, didn't he?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: And your mom and you and Matt went all over the United States to these mountain men rendezvous.  He'd dress up like a --

JESSICA HAINES: One time he dressed --

[The GAL]:  -- a big bear, a woolly -- a mountain man, wouldn't he?  And did you all sleep in the car and stuff like that when you would go on these trips?

ABIGAIL HAINES: We'd sleep in a trailer.

[The GAL]: In a trailer?

JESSICA HAINES: But before we had the trailer, we'd -- she would put the seats down and we each had pillows and --

[The GAL]: In the car?

JESSICA HAINES: Yeah.

[The GAL]: You were just kind of a couple of little gypsies, weren't you?  Do you know what that means?

JESSICA HAINES: No.

[The GAL]: Okay.  You were on the road a lot with Matt the Mountain Man, weren't you?

ABIGAIL HAINES: (Nods head affirmative.)

[The GAL]: And then he left left and then it was Tex and then it was Jerry --

ABIGAIL HAINES: No.

[The GAL]:  -- and then it was Tom.  Who --

ABIGAIL HAINES: It was Matt, there was Allen, then there was Matt again.

[The GAL]: Did Allen live with you too?

JESSICA HAINES: He spent the night a couple of times.

[The GAL]: He spent the night?  Okay.

ABIGAIL HAINES: There was Matt again, then it was Jerry, then Sam and then Jerry.

[The GAL]: Then Sam and then Gary?

ABIGAIL HAINES: Jerry.

[The GAL]: Jerry.  Did Sam live there too?

JESSICA HAINES: No.

[The GAL]: He spent the night some?

JESSICA HAINES: No.

ABIGAIL HAINES: Sam was in prison.

[The GAL]: Sam what?

ABIGAIL HAINES: Sam was in prison.

[The GAL]: Now, is Sam and Tex the same one?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: All right.  Okay.

ABIGAIL HAINES: Jerry, there was Tom.

[The GAL]: Is your mom married now?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: Who is she married to now?

ABIGAIL HAINES: Tom.

[The GAL]: And he's a pretty good guy, isn't he?  He treats you nice.

ABIGAIL HAINES: (Nods head affirmative.)

JESSICA HAINES: (Nods head affirmative.)

[The GAL]: And you're not saying any bad things about him.  And you've been visiting your mom down here at Gardner Place?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: How has that been going?

JESSICA HAINES: Good.  Good.

[The GAL]: Huh?  That's a pretty good place to visit, is it?

ABIGAIL HAINES: Uh-huh (affirmative).

[The GAL]: It's close.  Has your mom told you to, recently, to tell anything that's not true?

JESSICA HAINES: Huh-uh (negative).

[The GAL]: Or to throw any fits or --

ABIGAIL HAINES: No.

[The GAL]:  -- to act like -- has all that kind of stopped now?

ABIGAIL HAINES: Right.

[The GAL]: Okay.  And has your daddy told you to tell the Judge anything that's not untrue?

ABIGAIL HAINES: No.

JESSICA HAINES: Dad told us to always tell the truth.

[The GAL]: Your daddy told you to tell the truth?  And that's what I've told you, isn't it?

JESSICA HAINES: Yes.

[The GAL]: Okay.  But you all are real strong that you want to stay here, right?

JESSICA HAINES: Right.

ABIGAIL HAINES: (Nods head affirmative.)

[The GAL]: Okay?  Do you ever watch a tug of war on T.V. where there's -- or see it on the playground where there's a big, long rope and there's one team pulling on one end of the rope, one team --

ABIGAIL HAINES: Yeah.

JESSICA HAINES: (Nods head affirmative.)

[The GAL]: I guess sometimes you guys feel like the rope with your mom tugging on one end and your daddy tugging on the other end, don't you?

ABIGAIL HAINES: Yeah.

[The GAL]: What?

JESSICA HAINES: Yeah.

[The GAL]: And I bet you a dollar right now that Judge Young is going to end that today and you won't have to go through that anymore, what do you want to bet?  That would be nice, wouldn't it?

-10-

ABIGAIL HAINES: (Nods head affirmative.)

JESSICA HAINES: (Nods head affirmative.)

[The GAL]: There's been a lot of stress and pressure, hasn't there? Is that right?

ABIGAIL HAINES: Yes.

[The GAL]: Ms. Jess, how about you?

JESSICA HAINES: Yeah.

[The GAL]: Okay.  Have you got anything else you want to tell the Judge?

JESSICA HAINES: No.

[The GAL]: How about you, Abby?

ABIGAIL HAINES: I'd like to go back to visit my mom on weekends.

[The GAL]: Uh-huh (affirmative).

ABIGAIL HAINES: So I can see my old friends.

THE COURT: Yes.

JESSICA HAINES: I want to see Daisy.

[The GAL]: But if you do that, you don't want any pressure to tell fibs or being pressured to throw fits or anything like that, do you? You know what I'm talking about when I say throwing a fit, don't you?

ABIGAIL HAINES: Yeah.

[The GAL]: Crying and screaming.  You all were pretty good little actresses, weren't you?  What?  That wasn't any fun, was it?

JESSICA HAINES: Abby was the best.

[The GAL]: What?

JESSICA HAINES: Abby was the best.

[The GAL]: You were the best?

JESSICA HAINES: No, Abby was.

[The GAL]: Abby was.  All right.

JESSICA HAINES: A couple of times Dad told me to climb off and I got out of the thing and Dad had to climb up for Abby.

ABIGAIL HAINES: And then I'd be out by the time he got out.

JESSICA HAINES: And then you started kicking.

THE COURT: Pretty fast, aren't you?

ABIGAIL HAINES: No, I would stay up by the slide.

THE COURT: Oh, okay.  All right.

[The GAL]: And what else did you volunteer to do this morning? Do you remember you asked me if I was retiring and running for mayor, and you volunteered to vote for me, didn't you?

ABIGAIL HAINES: (Nods head affirmative.)

JESSICA HAINES: (Nods head affirmative.)

[The GAL]: I think that would be about the two best votes I could get, Judge.

THE COURT: I think so.  Well, that's good.  That's good.

[The GAL]: Who told you I was running for mayor?

ABIGAIL HAINES: Daddy.

[The GAL]: All right.